**FIRST NATIONAL BANK AND TRUST COMPANY OF VINITA, Oklahoma, a national banking association, Appellee,**

v.

**Jack KISSEE, Appellant,**

and

**Howard & Widdows, P.C., Gene C. Howard and P. Gae Widdows, individually, Additional Appellants.**

Nos. 69399, 69403.

Supreme Court of Oklahoma.

July 6, 1993.

As Corrected Sept. 21, 1993.

Thomas J. McGeaby, Logan, Lowry, Johnston, Switzer, West & McGeaby, Vinita, for appellee.

H. Gregory Maddux, Howard & Widdows, P.C., Tulsa, for appellant, Jack Kissee.

Lance Stockwell, Boesche, McDermott & Eskridge, Tulsa, for appellants, Howard & Widdows, P.C., Gene C. Howard & P. Gae Widdows.

PER CURIAM.

Two questions are presented for our determination.[1] The first is whether the district court erred in granting summary judgment for the bank and dismissing the counterclaim. And two, whether the district court should have imposed *in personam* sanctions against the individual attorneys and their law firm. We answer both questions negatively.

### I. FACTS

Appellee, First National Bank and Trust Company of Vinita, Oklahoma (Bank), filed suit against Appellant, Jack Kissee (Guarantor) on an absolute and unconditional guaranty given by guarantor to the bank in the sum of $125,000.00. Guarantor retained the law firm of Howard and Widdows, P.C., (H & W), to represent him. H & W filed an answer asserting the affirmative defense of *economic duress* exercised by the bank in obtaining the guaranty. H & W filed a counterclaim (called a *cross-petition* below) requesting $250,000.00 in actual damages and $1 million in punitive damages.[2]

After deposing guarantor, bank filed motions for summary judgment on the guaranty, and for sanctions against H & W for filing *sham and false* pleadings. Bank alleged H & W made numerous factual misrepresentations of a serious nature that both attorneys either knew or should have known were untrue. In their objection to the motions made by bank, H & W placed heavy reliance upon the affidavit of guarantor's oldest brother, Darrell Kissee, to further elaborate on their claim of economic duress.[3] Counsel for guarantor further alleged that bank breached both its covenant of good faith and fair dealings with

---

1. Guarantor raises a third issue concerning the amount of interest owed. However, the Journal Entry correctly stated the amount of interest owed by the guarantor. We are presented with no legal basis for reviewing a scrivener's error in the pleadings and one not raised prior to judgment.

2. Guarantor's attorneys alleged that bank, through its chief executive officer, Jack Nichols, (President): 1) knew that guarantor's brother, Darrell Kissee, and his business interests, especially Kissee Motors, were on the verge of financial collapse from 1984 to 1985; 2) conspired with Darrell Kissee to obtain guarantor's guaranty of Darrell's outstanding debts by assuring guarantor about the financial soundness of Kissee Motors and that Darrell's financial condition was the same for the past two years; 3) in order to alleviate Darrell's burgeoning unsecured indebtedness to the bank, bank's president, through Darrell, had knowingly directed the making of and accepted a forgery of guarantor's signature on an unrelated note, while guarantor was undergoing open heart surgery; 4) failed to disclose and did conceal vital information concerning the grave financial condition of Darrell and Kissee Motors, which would have influenced guarantor's decision in executing the guaranty.

3. Howard and Widdows argued that Darrell Kissee's affidavit was itself sufficient to support the contentions the bank: 1) initiated a common scheme and plan to better its position with reference to Darrell's indebtedness by (a) withholding information from guarantor which bank had an obligation to disclose, and (b) allowing Darrell to use guarantor's line of credit with bank; 2) was guilty of exercising economic duress against Darrell Kissee by (a) threatening to call his loans unless guarantor guaranteed the consolidation of such loans, and (b) threatening to stop Darrell's sale of Kissee Motors by foreclosing on its stock if Darrell did not cooperate with bank; 3) told Darrell he was over the legal lending limit with bank, and his loans needed to be "collateralized, restructured, or secured by additional party liability"; 4) made representations to Darrell and led guarantor to believe that guarantor's guaranty was conditional and would be released when Darrell (a) assigned the proceeds from the sale of Kissee Motors to bank, and (b) when Darrell's outstanding indebtedness was reduced below bank's legal lending limit; 5) breached its covenant of good faith and fair dealing when bank's promises went unheeded; and 6) was guilty of self-dealing in the transaction because of his ownership of stock in bank and that he had actual knowledge of and participated in the making of a forged note.

guarantor and its oral agreement to release guarantor.

After completing its deposition of guarantor's brother, Darrell Kissee, bank renewed its motions for summary judgment on its case in chief, and sought dismissal of guarantor's counterclaims with prejudice. At a hearing on bank's renewed motions for summary judgment and for sanctions, H & W requested additional time to consider whether further discovery was necessary. The continuance was granted. Thereafter, attorneys for guarantor filed an amendment to their answer and counterclaim. Following arguments from both parties concerning bank's motions, the district court took the motions under advisement.

The district court entered summary judgment for bank on its case in chief, and dismissed the counterclaims. Ten days after the district court entered its judgment for bank, H & W filed a request for written findings of fact and conclusions of law, a motion to transfer the cause to another judge, and an application for a continuance. During a hearing to determine bank's attorneys' fees, the district judge held H & W's motion was filed out of time.

Relying upon its *traditional equitable powers*, and 12 O.S.Supp.1984 § 2011, the district judge taxed an *in personam* judgment as sanctions, (attorneys' fees and costs), in favor of bank and against H & W and each attorney individually in the total amount of $7,698.49. This was the amount the trial court found the bank spent to defend against the counterclaim and the affidavit filed by H & W. For the reasons below, we affirm in part and reverse in part the judgments of the district court.

4. *Weeks v. Wedgewood Village, Inc.*, 554 P.2d 780 (Okla.1976).

5. *Weaver v. Pryor Jeffersonian*, 569 P.2d 967, 973 (Okla.1977).

6. *Flanders v. Crane Co.*, 693 P.2d 602, 605 (Okla. 1984).

7. *Northrip v. Montgomery & Ward Co.*, 529 P.2d 489 (Okla.1974).

## II. STANDARDS FOR SUMMARY JUDGMENT

 Summary judgment is appropriate and should be granted only where it is clear there is no substantial controversy as to any material fact.[4] All inferences and conclusions to be drawn from facts contained in the pleadings, admissions, exhibits, depositions, affidavits, interrogatories and the like, must be viewed in the light most favorable to the party opposing the motion.[5] By eliminating any trial of factual issues, the district court determines what party is entitled to judgment as a matter of law.[6] However, a summary judgment should be denied if the facts concerning any issue raised in the case are conflicting, or if reasonable people, in the exercise of fair and impartial judgment, might reach different conclusions upon consideration of any issue set forth in the case.[7]

 When the movant has shown there is no genuine issue as to any material fact, the opposing party has the obligation of showing some probative evidence, formulated as specific facts, to justify a trial of the issues.[8] A party cannot merely rely upon conjecture or suppositions, and assert "that facts exist or might exist, [because such] is not sufficient to create a substantial controversy when the party moving for summary judgment has introduced evidence showing the existence of facts which would preclude recovery by the party against whom the motion was made."[9] Thus, in opposing a motion for summary judgment, no party can withhold evidence tending to support the allegations in the pleadings until time of trial.[10]

8. *Runyon v. Reid*, 510 P.2d 943 (Okla.1973).

9. *Mengel v. Rosen*, 735 P.2d 560, 563 (Okla. 1987).

10. *Weeks v. Wedgewood Village, Inc.*, 554 P.2d 780 (Okla.1976).

## III. DISCUSSION

Guarantor's youngest brother, Larry Kissee (Debtor), was indebted to bank for $125,000.00 on a promissory note. Debtor, a car salesman, bought stock in his place of employment, Kissee Motor Company, (Kissee Motors), a Miami, Oklahoma Ford dealership which was owned by Darrell Kissee (Darrell), Debtor's and guarantor's oldest brother. The note was guaranteed by guarantor's written promise to accept liability for payment of Debtor's obligation.[11] The guaranty was supposedly renewed one year later. When Debtor defaulted, bank invoked the guaranty, guarantor refused to pay, and bank brought this action. Debtor and Darrell are not parties in this action.

### A. Bank's Case in Chief

The guaranty given the bank by guarantor is plain and unambiguous, and there is no allegation of accident or mistake of fact. To induce bank to extend credit to debtor, guarantor executed an *absolute* guaranty by which he *unconditionally* promised payment of debtor's principal contract on default.[12] Other than default, the instrument embodies no prerequisite performance of an act by debtor or bank, nor any condition precedent before guarantor's liability is operative. Here, the undisputed evidence shows bank pleaded a legally cognizable claim against guarantor by establishing a *valid and subsisting debt* owed

by guarantor on an absolute and unconditional guaranty.[13]

However, guarantor alleges he was wrongfully induced to make the guaranty because bank falsely and intentionally misrepresented the extent of his liability. He says the bank did this by coercing Darrell to falsely represent to guarantor that the guaranty would be released when Darrell's unsecured indebtedness was sufficiently reduced.

Guarantor testified that bank's president was not the one who said guarantor would be released from the guaranty. Instead, guarantor admitted that Darrell made the statement, but in the presence of bank's president. These events, guarantor argues, are sufficiently blame worthy by the bank to negate the guaranty agreement. We disagree.

First, the independent nature of guarantor's obligation is wholly contractual. Thus, our inquiry must "focus on the precise terms of the guarantor's undertaking—the dimension or breadth of the promise."[14] In the absence of accident, fraud, or mistake of fact, when the language of a written contract is complete, unambiguous and free from uncertainty as to the parties' intentions, parole evidence of prior representations, contemporaneous agreements or understandings tending to change, contradict, or enlarge the plain terms of the

---

**11.** The guaranty provides in pertinent part:
[T]he undersigned does hereby absolutely and unconditionally guarantee to you and to your assigns the prompt payment of any note(s) and other evidences of debt described below and any renewals, extensions or changes in form thereof which may be made without notice to us from time to time and for any term or terms (any or all of which hereinafter referred to as Items), together with interest and the reasonable cost of collection, including attorney's fees. The undersigned waives protest of any such Items, notice of the acceptance hereof, notice of default of the party(ies) to such Items and any other might be entitled, and agrees that renewals or extensions or changes in form of said indebtedness or any part thereof may be made by you from time to time without notice to the undersigned and without impairing or releasing the liability of the undersigned. Neither the taking or the release of security, nor the addition

of or the release of parties on said Items, nor the changing of the terms of form thereof, nor the illegality thereof, nor the release of liability of any party thereto, nor the lack of diligence on your part in the exercising any remedies against the parties to said Items shall release the undersigned from the absolute and unconditional liability of the undersigned hereunder.

**12.** *See* 15 O.S.1991 § 331. "A guaranty is to be deemed unconditional unless its terms import some condition precedent to the liability of the guarantor."

**13.** *See Loffland Brothers Co. v. Overstreet,* 758 P.2d 813, 822 (Okla.1988).

**14.** *Riverside Nat. Bank v. Manolakis,* 613 P.2d 438, 441 (Okla.1980). *See also Rucker v. Republic Supply Co.,* 415 P.2d 951 (Okla.1966).

written contract are inadmissible.[15] As a general rule of law, "[w]hether a contract is ambiguous to require extrinsic evidence to clarify the ambiguity is purely one of law for the court, and the construction of an unambiguous contract is a matter of law for the court."[16] Furthermore, with regard to guaranty agreements, the language used therein is construed most strongly against the guarantor.[17]

▮ Second, "fraud is never presumed and where a written agreement is attacked on the ground of fraud, that agreement will be upheld unless the allegations of fraud are established by clear and convincing evidence."[18] In the instant case, none of the elements of actual or constructive fraud, as set forth in 15 O.S.1991 §§ 58, 59 respectively, have been specifically pleaded and convincingly proved with clarity as required under 12 O.S.1991 § 2009.[19] Guarantor's arguments, based on Darrell's and not bank's alleged false representations prior to and contemporaneously with guarantor's execution of the guaranty agreement, even though made in the presence of the bank's official, are irrelevant, as are guarantor's allegations concerning Darrell's "burgeoning unsecured indebtedness to bank, and whether Darrell was on the verge of financial collapse." In *Master v. Boyes*,[20] this Court made it quite clear that:

> [U]nder an absolute and unconditional guaranty, the duty is upon the guarantor to see that his contract of guaranty is fulfilled, and that the obligations of the principal are discharged at maturity; and in the absence of fraud which may be the proximate cause of damage to the guarantor, a lack of notice and demand, or *the fact that the principal at maturity of his obligation was solvent and afterward became insolvent, does not constitute a defense that will discharge the guarantor from liability.*

This construction of guarantor's duty, when applied to the facts herein, leads us to the same conclusion made in *Abbot v. National Bank of Commerce*,[21] when this Court said:

> 'A guaranty is to be deemed unconditional, unless its terms import some condition precedent to the liability of the guarantor.'
>
> . . . .
>
> *A careful reading of the guaranty in the instant case fails to reveal any condition precedent whatever ..., we can reach no other conclusion than that the instrument in question was an unconditional guaranty, and a default in payment rendered the guarantor liable.*

Guarantor does not allege that his original guaranty was ever canceled, revoked, or returned any time prior to the commencement of this action by bank. Indeed, guarantor testified that he voluntarily executed the guaranty agreement at the request of Darrell.

However, although guarantor *admitted* that he executed the original guaranty agreement, he alleged that he did not guarantee the subsequent renewal note. Fur-

**15.** 15 O.S.1991 § 154. *See also Smart v. Bassler,* 101 Okla. 39, 223 P. 352 (1924); *Miller v. National Printing and Engraving Co.,* 172 Okla. 447, 45 P.2d 483 (1935).

**16.** *Ferrell Constr. Co. v. Russell Creek Coal Co.* 645 P.2d 1005, 1007 (Okla.1982).

**17.** *Riverside,* 613 P.2d at 442.

**18.** *Funnell v. Jones,* 737 P.2d 105, 108 (Okla. 1985).

**19.** *McNinch v. Northwest Thresher Co.,* 23 Okla. 386, 392, 100 P. 524, 526 (1909) (emphasis added) (dictum in third syllabus "overruled" in *Miller v. Troy Laundry Machinery Co.,* 178 Okla. 313, 316, 62 P.2d 975, 979) (1936). *But see Lefors v. Miami Building & Loan Ass'n.,* 183 Okla. 410, 412, 82 P.2d 1029, 1031 (1938) *and McCubbins v. Simpson,* 186 Okla. 417, 422, 98 P.2d 49 (1939).

If a party is induced to sign a contract by fraud, he can, of course, avoid it for that reason. It is, however, clear that *merely falsely representing to a man in possession of his faculties and able to read that a writing embodies their verbal understanding is not the fraud the law means.*

**20.** 44 Okla. 526, 531, 145 P. 363, 365 (1914) (emphasis added).

**21.** 176 Okla. 629, 630, 56 P.2d 886, 887 (1936) (emphasis added).

ther, guarantor argues that the renewal was forged by guarantor's oldest brother, and in his deposition guarantor testified that his signature on the renewal was indeed forged.

 Besides the allegation of forgery, this issue of renewal and extension raises the narrow question of whether an extension of time for payment, granted by bank to debtor without the consent of the guarantor, effectuates a discharge of guarantor's obligation. The giving and taking of a new note operates as an extension of time for payment of the original indebtedness. A guarantor is not discharged if he consents to an extension of time for payment, or when he has expressly agreed that the time for payment may be extended without notice.[22]

 An extension of time for payment of the debtor's obligation is expressly authorized in the guaranty agreement in the case at bar. Specifically, guarantor agreed that "renewals or extensions ... of said indebtedness or any part thereof may be made by you from time to time without notice to the undersigned and without impairing or releasing the liability of the undersigned." We conclude that bank's extension of time for payment of debtor's obligation did not result in the discharge of guarantor from liability. Viewing the record as did the district court, we conclude that there was no genuine issue of material fact and summary judgment was therefore proper.

### B. Guarantor's Answer and Counterclaim

In setting forth an alleged existence of a substantial question of fact, guarantor's argument is the same as asserted in the district court below. We conclude that guarantor's evidence does not support the allegations contained in their answer and erroneously styled counterclaim, or in the affidavit of Darrell Kissee. We consider guarantor's economic duress argument first.

### 1. Economic Duress

In his answer below guarantor first alleged that bank used economic duress against him in obtaining the guaranty. After guarantor's deposition was taken he then alleged that bank used economic duress against Darrell to induce the latter to obtain guarantor's signature on the original guaranty and to persuade guarantor to allow Darrell to use guarantor's credit line at bank. This way, guarantor asserts that bank's alleged coercive behavior against Darrell, somehow flowed and amassed to create coercive pressure on guarantor. Here on appeal, the allegation is that bank exercised economic duress against all three brothers: guarantor, Darrell and Debtor.

 We find no merit in guarantor's economic duress contentions. We have previously held that "the doctrine of economic duress/business compulsion should turn on the more conservative approach of whether the wrongful act is sufficiently coercive to cause a reasonable prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." [23] The presence of an unlawful or wrongful act is a prerequisite to the finding of economic duress.

 Upon consideration of all the circumstances surrounding the guaranty herein, there is no evidence indicating that the guaranty was the result of a wrongful or unlawful act, or was obtained by bad faith coercion or compulsion. The record discloses no evidence of any impaired bargaining power, superior knowledge, or unconscionable advantage between bank and guarantor. Guarantor conceded that bank's president exercised no coercive pressure against *him,* and that he was not deprived of exercising *his* free will. "Although the question of actual duress is always a question of fact for the jury, the trial court is not required to submit evidence to the jury which does not measure

---

**22.** *Oil Field Gas Co. v. International Supply Co.,* 187 Okla. 262, 103 P.2d 91 (1940).

**23.** *Centric Corp. v. Morrison–Knudsen Co.,* 731 P.2d 411, 416–419 (Okla.1986).

up to the required standard of proof." [24] The facts of this case are not legally sufficient to support an allegation of economic duress against guarantor, Darrell, or Debtor.

## 2. Covenant of Good Faith and Fair Dealing

On appeal, guarantor argues that "bank, by misrepresentation and outright deceit, engaged in a course of conduct solely to improve its position with respect to unsecured debts owed by Darrell and in so doing breached its implied duty of good faith and fair dealing" toward guarantor. The underlying issue raised by this contention is whether a breach of the implied covenant of good faith and fair dealing in a commercial context may give rise to an action in tort. Guarantor further contends that a bank has a *duty to warn* its customers or others if the bank knows or should have known that a third party is perpetrating a fraud against the customer.

▆▆▆▆▆ We strongly agree with guarantor's primary contention that banks have an obligation to exercise good faith and fair dealing with its customers. The common law imposes this implied covenant upon all contracting parties, that neither party, because of the purposes of the contract, will act to injure the parties' reasonable expectations nor impair the rights or interests of the other to receive the benefits flowing from their contractual relationship. [25] However, what guarantor fails to recognize is that in *Rogers v. Tecumseh Bank*, [26] this Court held that without "gross recklessness or wanton negligence on behalf of a party" to a commercial contract, a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract.

We made it clear in *Rogers*, that our seminal holding in *Christian v. American*

*Home Assurance Co.*, [27] does not generally apply to the relationship between a bank and its customer. In *Christian*, this Court held that in an insurance context, a breach of the implied covenant of good faith and fair dealing by the insurance carrier "gives rise to an action in tort for which consequential, and in a proper case, punitive damages may be sought" by the insured. In *Rogers*, we emphasized the *special relationship* between an insurer and insured which differentiates insurance contracts from commercial contracts. Our reluctance to extend *Christian* and its progeny beyond the insurance field was also illustrated in *Hinson v. Cameron*, [28] where this Court refused to apply *Christian* to an at-will employment relationship. Again, we refuse to expand our *Christian* holding to banking relationships.

Our examination of decisions of other jurisdictions discloses that the great weight of authority, and what we consider to be the best-reasoned opinions, support our previous statement in *Rogers*, that "to impose tort liability on a bank for every breach of contract would only serve to chill commercial transactions. This is not to say that under every fact situation arising for a breach of contract that recovery may never lie." [29]

Upon consideration of the parties' reasonable expectations concerning the enforcement of the guaranty agreement herein, we conclude that bank did not breach its implied covenant of good faith and fair dealing, or commit any independent tortious conduct against guarantor. Guarantor failed to produce any evidence to support his contention that bank's president acted in reckless disregard for guarantor's rights during the inception of the guaranty agreement. Indeed, the bank president's negligence and awareness that the guaranty agreement was somehow tainted *ab ini-*

---

24. *Id.* at 417.

25. *Western Natural Gas Co. v. Cities Service Gas Co.*, 507 P.2d 1236 (Okla.1972). *See also* 12A O.S.1991 § 1–203; *Hall v. Farmers Ins. Exchange*, 713 P.2d 1027 (Okla.1985).

26. 756 P.2d 1223, 1227 (Okla.1988).

27. 577 P.2d 899 (Okla.1977).

28. 742 P.2d 549 (Okla.1987).

29. *Downing v. First Bank*, 756 P.2d 1227 (Okla. 1988).

*tio* are the only instances of bad faith alleged under this cause of action.

■ However, guarantor admitted that he borrowed money from the bank for Darrell, and he personally lent money to his brother. Darrell corroborated this financial interrelationship by testifying that guarantor knew that some of Darrell's loans were placed under guarantor's line of credit with bank. Upon further consideration of the family ties and former business partnerships between guarantor and Darrell, we do not see any logic in guarantor's contentions that bank's president: 1) had an obligation to inform guarantor about how the proceeds of Debtor's loan were going to be distributed; 2) had a duty to advise guarantor to review Darrell's financial statement; and 3) had an obligation to make guarantor aware of Darrell's substantial indebtedness to bank.

Having found no breach of the duty of good faith on the part of bank that would relieve guarantor of his obligation, we perceive no sound reason or logical basis to support guarantor's *duty to warn* argument. There is no justification for holding that in a debtor-creditor relationship, a bank has a duty to warn its customers concerning the bank's opinion about the customer's financial dealings with one of the customer's family members. Guarantor's claim that bank breached its duty of good faith and fair dealing by failing to inform guarantor about Darrell's alleged precarious financial conditions or to rectify Darrell's alleged misrepresentations to guarantor concerning the guaranty have no legal significance.

### 3. Fiduciary relationship

With respect to the existence of a special relationship, guarantor's next contention, focusing on the evolving and unique nature of the relationship between banks and society at large, is that the traditional debtor-creditor relationship is changing to that of fiduciary-beneficiary.[30] In supporting his proposition that a *special relationship* exists between a bank and its customer, guarantor cites *Djowharzadeh v. City Natl. Bank & Trust Co.*[31] However, guarantor readily concedes and we agree that *Djowharzadeh* is distinguishable from the instant case. The decision is not persuasive in aiding guarantor's argument.

Guarantor then emphasizes, by analogy to insurance contracts, the following distinguishable features of the banking industry: the customer's lack of financial power and leverage; the public's confidence, trust and dependence upon banking institutions; the *special duties* imposed upon banks, and the public interest status that banks have attained due to the essential and personal financial services provided to the public. Guarantor additionally claims that throughout his dealings with bank, he relied on the expertise and guidance of bank's president in handling his financial investments. Thus, guarantor argues that his relationship with bank was far beyond that of mere debtor and creditor. In light of the facts of this case, we think not.

■ Oklahoma recognizes the common law rule that the relationship between a bank and its customer is not fiduciary in nature, but is that of creditor-debtor.[32] In all cases, the determination of the existence of a fiduciary relationship depends upon the factual circumstances, including the re-

30. *See, e.g.,* Kitada, *Banking Decisions: Emerging Theories of Bank Liability—The Breach of the Covenant of Good Faith and Fair Dealing,* 103 Banking L.J. 80 (1986); Symons, *The Bank–Customer Relation,* 100 Banking L.J. 220 (1983).

31. 646 P.2d 616, 619 (Okla.App.1982). In *Djowharzadeh,* a prospective loan applicant sued bank and bank's loan officer for damages resulting from the loss of the applicant's real estate investment opportunity. A loquacious loan officer had wrongfully disclosed the loan applicant's confidential financial investment infor-

mation to the wives of other bank officials, who later bought the investment property. The Oklahoma Court of Appeals held that a bank's relationship with a potential loan applicant implicitly imposes the duty on bank to keep the contents of the loan application confidential.

32. *State Guar. Bank v. Doerfler,* 99 Okla. 258, 226 P. 1054 (1924); *Brown v. Eastman Natl. Bank,* 291 P.2d 828 (Okla.1955); *Ingram v. Liberty Natl. Bank & Trust Co.,* 533 P.2d 975 (Okla. 1975).

lationship of the parties involved, to each other and to the disputed transaction.[33]

■ In the instant case, guarantor was not a long-time customer or corporate depositor of the bank. No evidence was presented that guarantor had a checking or a savings account with bank. Guarantor established a creditor-debtor relationship with bank in the 'early eighties' after Darrell recommended bank to him. Guarantor originally borrowed a sum of money from bank to consolidate his oil business debts with other small investment debts. However, guarantor did not ever seek any financial assistance in his then retail automobile dealership, nor did guarantor repose any special confidence in bank concerning his business and private investments. There was no direct contact between guarantor and bank regarding Kissee Motors prior to the guaranty at issue.

Guarantor did not seek the advice, confidence, trust, nor rely on bank or its president, nor did he have any discussions with any bank employee concerning his various business investments. There is no evidence or persuasive testimony indicating that bank ever served as guarantor's financial adviser. In other words, guarantor's deposition testimony illustrated both his own expertise in the automobile retail business and his capacity to make independent business investment decisions. Bank did not induce guarantor to enter into the absolute and unconditional guaranty agreement. Darrell did such. As a matter of law, we conclude that no substantial competent evidence supports a finding of a fiduciary relationship between bank and guarantor.

Having fully reviewed the case record, the depositions of the witnesses, and the arguments presented by the parties, we accept and affirm the district court's findings of fact and conclusion of law insofar as the arguments presented will not overcome summary judgment.

## C. Sanctions

We now consider whether the district court erred when it imposed *in personam* sanctions against H & W individually and their law firm. H & W argue that the district court must find *subjective bad faith* on the part of both attorneys and that the filed pleadings were patently meritless in order to find a violation of 12 O.S.Supp. 1984 § 2011. H & W contend that the "only proper circumstances in which a court may sanction an attorney for presenting unsupported arguments of law is where the question has been conclusively decided in a case with facts virtually identical to those in the case where sanctions are sought."

The district court found that the Defendant had made numerous factual representations in the Answer and Cross–Petition that proved to be *sham and false* and were repudiated in deposition testimony by the Defendant. Further, these misrepresentations were so numerous and of such a serious nature that the Court was convinced counsel for the Defendant either knew or should have known the representations were untrue. The court determined that Counsel for Defendant had obstructed and delayed the adjudication of this case by "filing meritless pleadings containing purported arguments of law which were unsupported either by existing authorities or by any good faith argument for the extension of existing law."

The court resolved that it had the right to levy fees under § 2011, where an attorney's signature on a pleading "constitutes a certification of truthfulness and good faith" or under its *traditional equitable powers* if an attorney litigated in *bad faith*. In the instant case, the trial court relied on both its *traditional equitable powers* and § 2011 as a basis for imposing sanctions. In light of this, we must analyze the trial court's decision under both tests. We will address the court's finding regarding § 2011 first.

**33.** *Reeves v. Crum,* 97 Okla. 293, 225 P. 177 (1924); *Lewis v. Schafer,* 163 Okla. 94, 20 P.2d 1048 (1933); *Mahan v. Dunkleman,* 205 Okla. 54, 234 P.2d 366 (1951).

Under the 1984 version of § 2011 applicable herein, the signing of pleadings certifies the attorney has

read the pleading; that to the best of his knowledge, information and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this section, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a willful violation of this section, an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted.

Bank agrees that section 2011 is "derived directly from Rule 11 of the Federal Rules of Federal Procedure...."[34] Federal case law maintains that the purpose of rule 11 is to keep issues out of a case that the attorney knows are false and to hold the attorney to strict accountability.[35] The rule uses subjective terms[36] and the standard for judging an attorney's behavior is bad faith.[37] Thus, if an attorney is in good faith in pleading facts and making legal argument, he has not transgressed the letter or spirit of rule 11.[38]

Rule 11 was amended in 1983. Although the amendment is irrelevant to our case, the *differences* between the old and new rule are pertinent to our analysis of the case at bar. The drafters of the new rule intended lawyers be held to a more stringent standard than the original Rule's good-faith requirement. In *Eastway Constr. Corp. v. City,*[39] a federal court stated that "no longer is it enough for an attorney to claim that he acted in good

faith, or that he personally was unaware of the groundless nature of an argument or claim." In *Zaldivar et al., v. City et al., and Salazar et al.,*[40] the court maintained that "the new test represents an intentional abandonment of the subjective focus of the Rule in favor of an objective one." "Simply put, *subjective good faith no longer provides the safe harbor it once did.*"[41] "There is no room for a pure heart, empty head defense under Rule 11."[42]

With these principles in mind, we begin our analysis of § 2011. As stated, § 2011 mandates that the attorney has read the pleading, that to the best of his knowledge, information and belief, there is good ground to support it and that it is not interposed for delay. In *Broadwater v. Courtney,*[43] this court considered whether it was an abuse of discretion for the trial court to deny attorney fees based on the conclusion that the record did not demonstrate that the lawsuit was not well grounded in fact or frivolous.

The case involved a suit between real estate brokers for interference with contractual relations and punitive damages. The district court sustained the demurrer and entered judgment for defendant. Defendant filed an application for attorney fees pursuant to 23 O.S.Supp.1986 § 103 and 12 O.S.Supp.1986 § 2011. The trial judge denied the application for attorney fees. In reviewing the trial court's decision, we stated the following:

Sustaining a demurrer to the evidence does not mean that the trial court found the lawsuit not well grounded in fact; only that the evidence presented does not create a prima facie case of the theory of

**34.** Appellee's Brief in support of motion for summary judgment and for sanctions, R. at 13.

**35.** *American Auto. Assoc. v. Rothman,* 104 F.Supp. 655 (D.N.Y.1952).

**36.** *Nemeroff v. Ableson,* 620 F.2d 339, 350 (2nd Cir.1980).

**37.** *Id.* at 350; *Gieringer v. Silverman,* 731 F.2d 1272 (7th Cir.1984).

**38.** *Id.; Bandillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1167 (7th Cir.1983).

**39.** 762 F.2d 243, 253 (2nd Cir.1985).

**40.** 780 F.2d 823, 829 (9th Cir.1986).

**41.** *Eastway Constr. Corp.,* 762 F.2d at 253 (emphasis added).

**42.** Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 182 (1985).

**43.** 809 P.2d 1310 (Okla.1991).

law upon which the claim is based. In cases where abuse of discretion is raised, the discretionary action will be reviewed and if abuse is involved, the abuse will be corrected. To reverse a trial court under abuse of discretion, it must be found that the trial judge made a clearly erroneous conclusion and judgment, against reason and evidence. Thus, the important focus of review for abuse of discretion is the actual review by the trial judge of pleadings and of the evidence presented.[44]

■ Applying these principles to our own statute, we determine the following: 1) there was no evidence that H & W did not read the pleadings before filing them; 2) nor was there evidence the attorneys knew or believed there were no grounds to support the pleadings[45]; and 3) there was no evidence that the attorneys interposed the pleadings for delay.[46] Moreover, the following facts were specifically pled: 1) Jack and Darrell established a relationship with First of Vinita in the early 1980's; 2) both Jack and Darrell had an ongoing relationship with the same bank president; 3) the bank president knew at all times of Darrell's financial status; and 4) Jack and Darrell both stated that Darrell told Jack *in the presence of the bank's president,* that Jack would be released of all liability on Darrell's loans when the balance due on loans was reduced to below the bank's lending limits.

Considering this, we cannot say categorically that H & W's representation *under the 1984 version of § 2011* warranted sanctions. As H & W correctly point out, the question is whether the attorney acted in *bad faith.* And more specifically, whether the attorney acted in *good faith* in pleading facts and presenting legal arguments. The record does not support a finding of *bad faith* under standards enunciated above and for that reason, we reverse the award of sanctions.[47]

One further note, in 1987 § 2011 was revised, after the facts here had occurred. An attorney is *now* required to make a reasonable inquiry before signing the pleadings. Consequently, our decision should not be considered representative of acceptable standards under § 2011 as amended.

The trial court also imposed sanctions on the basis of its *inherent equitable power* to do so. Given the evidence discussed above, we likewise find that imposition of fees and costs under the court's *inherent equitable powers* was not warranted. *Winters v. City of Oklahoma City* is analogous to the present case.[48] In *Winters,* City argued that plaintiff's attorney was acting in "bad faith or obdurate obstinacy" in continuing to assert the same theory of liability against the City despite adverse rulings on the same type of claim in *three* of Attorney's previous lawsuits against the City. The trial court under its *inherent equitable powers* taxed the attorney for his oppressive actions and under the facts of that case, we affirmed, holding the trial court did not abuse its discretion in doing so.

In *Winters,* we developed several legal principles. We stated that attorney's fees should not be assessed lightly or without fair notice and an opportunity for a hearing. An attorney should be allowed to file any lawsuit necessary in order to assert his

---

**44.** *Id.* at 1312 (citations omitted).

**45.** Case law was given in support of the Defendant's various legal theories.

**46.** Plaintiff bank argued H & W acted in bad faith because at one point a continuance was given to H & W purportedly for the reason that the latter needed additional time to take further discovery. No additional discovery was conducted. However, a reading of the record reveals that H & W were under no obligation to do so, nor did the lawyer state that he would take such action. Rather, as we read the rec-

ord, the additional time was requested to consider whether or not further discover was warranted. Transcript of Proceedings, June 11, 26–27. We find the other examples offered by Bank as showing H & W's attempt at delay likewise unpersuasive here.

**47.** For this reason, we need not address this court's decision in *Unit Petroleum Co. v. Nuex Corp.,* 807 P.2d 251 (Okla.1991), wherein we held that sanctions could not be assessed against a law firm.

**48.** 740 P.2d 724 (Okla.1987).

clients' lawful claims, however, lawsuits should not be allowed to proliferate at defendants' repeated expense. And finally, there must be a finding of *bad faith* or *oppressive behavior.*[49]

Considering the evidence analyzed above and applying it to the test set forth in *Winters,* we maintain the record does not support a finding of *bad faith* or *oppressive behavior* on behalf of H & W. We therefore reverse the trial court's decision to assess sanctions against H & W.

## IV. CONCLUSION

For the reasons discussed herein, we affirm the trial court's grant of summary judgment in favor of the bank and dismissal of the counterclaim. We reverse the award of sanctions imposed on H & W under 12 O.S.Supp.1984 § 2011 and the trial court's inherent powers. The district court's judgment is AFFIRMED IN PART and REVERSED IN PART.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, HARGRAVE, ALMA WILSON, SUMMERS and WATT, JJ., concur.

KAUGER, J., concurs in part; dissents in part.

---

**49.** Our affirmance of the trial court's decision was based on its "inherent power" to assess attorney's fees. However, we noted in *Winters,* 740 P.2d at 728 n. 22, that had the petition been filed two weeks later, 12 O.S.Supp.1984 § 2011 would have provided a statutory basis for assessing attorney fees.