**BUCK'S SPORTING GOODS, INC. OF TULSA, an Oklahoma Corporation, Appellant,**

v.

**FIRST NATIONAL BANK & TRUST COMPANY OF TULSA, a national banking association, Appellee.**

No. 78163.

Supreme Court of Oklahoma.

Feb. 1, 1994.

As Corrected Feb. 7, 1994.

Thomas M. Klenda, Robert J. Getchell and John M. O'Connor, Tulsa, for appellant.

James L. Kincaid and Gary L. Betow, Tulsa, for appellees.

KAUGER, Justice.

Certiorari was granted to consider a single issue: whether there are material issues of fact in controversy concerning the alleged breach of the credit agreement which must be determined by the trier of fact.[1] We find that there are.

## FACTS

The appellant, Buck's Sporting Goods of Tulsa (Buck's/borrower), sold sporting goods. The majority of Buck's business came from selling equipment to schools. In 1964, Buck's entered into a line of credit agreement with the appellee, First National Bank & Trust Company of Tulsa (First Tulsa/bank/lender). The agreement was updated in 1980 and in 1987. Under the agreements, Buck's was given a maximum amount of revolving credit. When schools placed orders for equipment, Buck's ordered the goods from its factory suppliers; and when payments to the factories became due, Buck's borrowed on its line of credit with First Tulsa. After the schools paid for the equipment, Buck's used the money to reduce its line of credit.

To receive substantial discounts from its factories, Buck's was required to pay its accounts in full by April 10, for basketball season, and by October 10, for football season. For the twenty-three years that Buck's did business with First Tulsa, it always borrowed the maximum amount of its credit line on these dates. The bank was aware of this practice, and its economic importance to Buck's.[2]

In 1986, Buck's reported a year-end loss. When it learned of the loss, First Tulsa met with Buck's. Buck's loan officer at First Tulsa, W.E. Beard (Beard), sent a letter to Buck's asking for a capital infusion; or, in the alternative, the bank requested other proposals to strengthen the relationship and to enable the bank to renew the line of credit.[3] On July 8, 1987, Buck's and First Tulsa entered into the "Amended, Revised and Restated Revolving Credit Agreement" (agreement/credit agreement). Although Buck's did not make a capital infusion, the bank approved the loan and increased Buck's line of credit to $425,000. As security, Buck's gave the bank: 1) a pledge of all the store assets; 2) a promise to deposit all receipts and cash into a collection, or blocked, account to which Buck's had no access;[4] 3) a mortgage on the home of Buck's president, Robert Duncan (Duncan); 4) a pledge of all benefits from Duncan's life insurance policies; and 5) personal guarantees

---

1. We have previously addressed the issue of a bad faith breach in the commercial context. *Rodgers v. Tecumseh Bank*, 756 P.2d 1223, 1227 (Okla.1988) and *First Nat'l Bank & Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 509 (Okla.1993).

2. Beard testified on p. 72 of his deposition:
 "Q. What is your understanding of the importance of October 10?
 A. I understand that it's important to Buck's.
 Q. Why?
 A. Because that's the period in which they pay their bills that have been going on for sometime and they have some discounts in connection with some of them."

3. The letter, dated February 12, 1987, provides in pertinent part:
 "... As we discussed today, the capital impairment of the company has become critical and steps should be taken to remedy this situation as quickly as possible. It is my opinion that a minimum capital infusion of $150M should be made and should occur by April 1, 1987. By capital infusion I mean an investment in the company which could be in the form of common stock, preferred stock, or capital notes.

 Bob, should the foregoing not be feasible or only partly feasible, the Bank would welcome other proposals that would strengthen the relationship and enable the Bank to renew the line of credit for the coming season...."

4. In the 1987 Agreement, paragraph 3.3 explains the collection account. It provides in pertinent part:
 "... Until the Bank shall otherwise instruct the Borrower in writing the Borrower will diligently attempt to market its inventories in the ordinary course of business (but not otherwise) and to collect all moneys due to it arising out of such sales and owed to it upon its Accounts, Instruments, Chattel Paper and other obligations of its customers to pay moneys to it. **Until notified otherwise by the Bank, all collections, including all checks and cash receipts from sales of inventory, shall be deposited in a special collection account with the Bank with respect to which Borrower shall have no right of withdrawal....**" (Emphasis supplied.)

of Buck's principals to its previous owner worth $1.4 million.

On October 7, 1987, Buck's requested, via telephone, an advance of $212,519 for payment to its factory suppliers by October 10.[5] This would have raised Buck's outstanding balance to its credit line limit. According to Duncan, when he asked Beard about the advance, Beard replied that it "would be no problem."[6] Although Beard denied this;[7] the parties agree that on October 8, 1987, First Tulsa refused to make the advance.[8] This was two days before payments were due to the factories, leaving Buck's no time to obtain alternate financing. When Buck's asked Beard what to do about the factories on October 8th, Beard allegedly replied, "I guess you'll just have to let your factories ride." Buck's insists that no explanation was given for the refusal to advance the funds, and that Beard, the only person at First Tulsa completely familiar with the account, left for a ten-day vacation the next day. Because all of Buck's cash was in the blocked collection account, no funds were available to pay any suppliers by October 10. First Tulsa insists that the line of credit was never canceled, considered in default, nor was the debt accelerated. Buck's claims to be unaware of the account's standing. It assumed that the lending relationship with First Tulsa terminated when the advance was refused.

Although Buck's obtained a new line of credit with Western National Bank on October 20, 1987, all of the factory discounts were lost. Buck's claims that it was put on credit hold by the factories, that it was charged late fees and interest, and that it lost credibility with its school clients. Buck's eventually filed a Chapter 11 bankruptcy proceeding, alleging that it could never recover from the economic harm caused by First Tulsa's refusal to make the advance.

On December 23, 1987, Buck's sued alleging breach of contract, tortious breach of contract, breach of fiduciary duty, constructive fraud and prima facie tort. Buck's claims that because of the implied duty of good faith and because of a continuous course of dealing with the bank, First Tulsa

5. The loan agreement in paragraph 2.6 provides in pertinent part:

"... The bank may, in its discretion, agree to make one or more advances of loan funds requested by telephone by Borrower and on a date other than a Weekly Settlement Date. In any instance where an advance of loan funds shall be made by the Bank to the Borrower on a telephonic request the Borrower shall furnish a Loan Request to the Bank for such advance on the next ensuing banking day ..."

6. The president of Buck's, Robert Duncan, stated in his deposition:

"A. Okay. On Wednesday, we had to—Mr. Beard was going on vacation, and we had to close our books early, and I had instructed my bookkeeper, Carolyn Rotert, to make sure that you've got the books closed, so that we know the receivables, we know what our inventory is, and we will know what our loan balance is, so we know how much that we can request to borrow. And we requested to borrow up to the maximum amount of the line of credit, which was up to $425,000. And the amount that we were requesting was $212,000 and I don't know the balance of the figure, but at $212,000 that would have brought the Note to $425,000, and he [Beard] was informed of that on Wednesday [October 7, 1987]. So the amount was already established.
Q. How do you know he was informed of that on Wednesday?

A. Because I called him and gave him those figures right off of our report.
Q. On the telephone?
A. Yes, sir, which is customary. We've always done that in advance of actually taking it down, so he has an idea of what it is, because he hasn't seen our report at this point. . . .
Q. And were the numbers that you gave him by telephone the same numbers that appear in [the Loan Request]?
A. Yes, sir.
Q. Which you, then, delivered on the following day?
A. Yes, sir.
Q. Now, what was his response when you gave him those numbers [on Wednesday in the telephone conversation]? . . .
A. He said, 'well, this, basically, brings your borrowing base up to the limit of $425,000.' And he said, 'we have no problem with that.'
. . .
Q. So you gave him the numbers, and he said, 'we have no problem with that'?
A. That's right."

7. Although Duncan's testimony indicates that he gave figures to Beard during the October 7th telephone conversation, see note 6, supra, Duncan insists that the first time he was aware of the figures was when the written information was submitted on October 8.

8. First Tulsa advanced $50,000 to Buck's to pay for operating expenses and payroll.

should have given reasonable notice before refusing to make the credit line advance. On June 15, 1989, Buck's amended its petition to add claims for gross negligence and interference with contractual relations. On April 11, 1990, First Tulsa filed its first motion for summary judgment. Buck's filed a cross-motion for summary judgment on June 4. The trial judge granted an interlocutory summary adjudication to First Tulsa on all counts except the breach of contract claim.

In an order entered on December 19, 1990, the trial court gave Buck's time to amend its petition. Buck's amended the petition on December 20, restating its breach of contract and fraud claims. First Tulsa again moved for summary judgment. The trial court sustained the motion holding there was no breach. It relied on contract language providing that "First Tulsa is not obligated to make any particular loan or advance requested by Buck's." [9] The court also ruled that there is no implied-in-law duty to act reasonably in a revolving credit agreement if the parties do not impose the duty in the contract itself, and that the evidence did not support Buck's contention that the bank telephonically agreed to grant the requested advance. The Court of Appeals affirmed. Certiorari was granted on June 14, 1993, to determine whether there are material issues of fact in controversy concerning the alleged breach of the credit agreement.

**9.** The Amended 1987 agreement is a 17–page document. The pertinent parts are as follows:

"2.1 *Bank Not Obligated To Make Advances.* The Bank shall not be obligated to make any particular loan or advance requested by Borrower ...
4.1 *Guaranties.* The Bank shall not be obligated to make any loan or advance to the Borrower at any time **unless there shall remain in full force and effect unconditional written guaranties** in form acceptable to Bank covering all Secured Indebtedness of the Borrower to the Bank ...
6.1 *Defaults* ... the Bank shall be entitled **upon notice to the Borrower** to declare all of the Secured Indebtedness to be immediately due and payable ... From and after any such notice the Bank shall have no further obligation to make any loan or advance to the Borrower hereunder whether or not any prior defaults shall be cured." (Emphasis supplied.)

## CONTROVERTED MATERIAL FACTS EXIST CONCERNING THE ALLEGED BREACH OF THE CREDIT AGREEMENT WHICH MUST BE RESOLVED BY THE TRIER OF FACT.

Buck's insists that there are controverted material facts concerning the 1987 credit agreement and the conduct between itself and First Tulsa's loan officer which militate against the grant of summary judgment. It argues that: 1) once Beard told Duncan by telephone on October 7 that it "would be no problem" to advance the maximum credit limit that an agreement was reached; and 2) First Tulsa's refusal to advance the funds on October 8 constituted a breach of the credit agreement. First Tulsa relies upon the express language of paragraph 2.1 of the contract providing that the Bank is under no obligation to make any loan or advance [10] for the proposition that there was no breach. The bank asserts that there was no breach, because there was no obligation to make the advance.

Pursuant to Rule 13, 12 O.S.1991, Ch. 2 App., Rules for the District Courts, a motion for summary judgment may be filed if the pleadings, depositions, interrogatories, affidavits, and other exhibits reflect that there is no substantial controversy pertaining to any material fact.[11] Even when basic facts are undisputed, motions for summary judgment should be denied, if from the evi-

**10.** Paragraph 2.1, Amended 1987 agreement, see note 9, supra.

**11.** *Buckner v. General Motors Corp.*, 760 P.2d 803, 812 (Okla.1988); Rule 13, 12 O.S.1991, Ch. 2 App. provides in pertinent part:

"a. A party may move for judgment in his favor on the ground that the depositions, admissions in the pleadings, stipulations, answers to interrogatories and to requests for admissions, affidavits, and exhibits on file ... show that there is no substantial controversy as to any material fact ...
b. If the adverse party ... wish[es] to oppose the granting of the motion, they shall serve on the moving party and file ... a concise written statement of the material facts as to which he or they contend a genuine issue exists ... The adverse party shall attach to the statement affidavits and other materials containing facts that would be admissible in evidence ..."

dence, reasonable persons might reach different inferences or conclusions from the undisputed facts.[12] Summary judgment is proper only when the pleadings, affidavits, depositions, admissions, or other evidentiary materials establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[13] All conclusions drawn from the evidentiary material submitted to the trial court are viewed in the light most favorable to the party opposing the motion.[14] A fact is "material" if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action.[15]

 Contractual intent is determined from the entire instrument. Whenever possible, an interpretation will be adopted which gives effect to all provisions of the contract.[16] The 1987 Agreement between Buck's and First Tulsa contains at least three clauses which appear to limit the circumstances under which an advance will be made. As First Tulsa notes, paragraph 2.1 provides that First Tulsa was not required to make any loans.[17] Paragraph 4.1 indicates that First Tulsa was not required to make advances "unless there shall remain in full force and effect unconditional written guaranties." [18] Finally, paragraph 6.1 provides that First Tulsa had "no further obligation to make any loan" after notice of default.[19] However, paragraph 2.6 specifically states that:

"... The bank may, in its discretion, agree to make one or more advances of loan funds requested by telephone by Borrower and on a date other than a Weekly Settlement Date. In any instance where an advance of loan funds shall be made by the Bank to the Borrower on a telephonic request the Borrower shall furnish a Loan Request to the Bank for such advance on the next ensuing banking day ..."

It is unnecessary to strike any one of these provisions to give effect to all. First Tulsa does not assert that there was some defect in the guaranties in place for the line of credit,[20] and the bank never gave notice of default. Even if paragraph 2.1 is given the strictest interpretation argued for—i.e., First Tulsa had no obligation to make any loan to Bucks, paragraph 2.6 outlines a circumstance in which a loan may, in the bank's discretion, be advanced. Paragraph 2.6 gave Beard the authority to make a telephonic advance. This is precisely what Buck's asserts occurred. Construing the provisions together, we find no conflict.

This Court will not diminish a borrower's right clearly and specifically provided in a contract.[21] One of the material unresolved factual disputes between First Tulsa and Buck's involves circumstances surrounding the alleged telephonic approval of the loan on October 7.[22] Buck's claims that First Tulsa

**12.** *Federal Deposit Ins. Corp. v. Moss*, 831 P.2d 613, 620 (Okla.1991); *Wofford v. Eastern State Hosp.*, 795 P.2d 516, 520 (Okla.1990); *Roach v. Atlas Life Ins. Co.*, 769 P.2d 158, 163 (Okla. 1989).

**13.** *Buckner v. General Motors Corp.*, see note 11, supra.

**14.** *Ross v. City of Shawnee*, 683 P.2d 535, 536 (Okla.1984).

**15.** *Hadnot v. Shaw*, 826 P.2d 978, 985 (Okla. 1992).

**16.** Title 15 O.S.1991 § 157 provides:

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."
*Mercury Inv. Co. v. F.W. Woolworth Co.*, 706 P.2d 523, 529 (Okla.1985).

**17.** Paragraph 2.1, Amended 1987 agreement, see note 9, supra.

**18.** Paragraph 4.1, Amended 1987 agreement, see note 9, supra.

**19.** Paragraph 6.1, Amended 1987 agreement, see note 9, supra.

**20.** In fact, the collateral for the loan was increased substantially before the 1987 agreement was finalized. See discussion, p. 695, supra.

**21.** *Rodgers v. Tecumseh Bank*, see note 1 756 P.2d at 1225, supra. See also, *Rist v. Westhoma Oil Co.*, 385 P.2d 791, 796 (Okla.1963).

**22.** Listed under "undisputed facts" in First Tulsa's motion for summary judgment is an assertion that Beard did not have the full facts surrounding the advance until a written request was received by the bank. Beard's deposition testimony also indicates that some telephone ad-

orally agreed to give the advance in a telephone conversation.[23] Duncan's deposition stating that the advance would be "no problem" directly conflicts with Beard's testimony that he doesn't recall discussing the borrowing base at all with Buck's before the October 8 meeting.[24] According to the agreement, the bank could make advances of loan funds requested by telephone.[25] If First Tulsa agreed to make the loan, a breach may have occurred when it reneged the following day. The material facts surrounding a possible breach of the credit agreement are in dispute. These conflicting facts present a question for resolution by the trier of fact.[26]

### CONCLUSION

Summary judgment is properly granted when there is no substantial controversy as to any material fact.[27] Controverted material facts exist concerning a possible breach of the commercial contract which must be determined by the trier of fact. These unanswered questions of fact militate against the granting summary judgment.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF APPEALS OPINION VACATED; TRIAL COURT REVERSED.**

OPALA, ALMA WILSON, SUMMERS and WATT, JJ., concur.

HODGES, C.J., and SIMMS and HARGRAVE, JJ., dissent.

LAVENDER, V.C.J., dissents. I would deny certiorari.

vances had been made in the past, but that he had not discussed the advance before the denial on the morning of October 8.

23. Pertinent deposition testimony appears in note 6, supra.

24. Beard's deposition provides in pertinent part: "... Q. Okay. What was discussed during these telephone conferences to arrange a meeting?
A. There was nothing discussed, except it was imperative that Mr. Duncan and I have a conference.

Q. Did Mr. Duncan give you his borrowing base figures over the phone during any of these telephone conversations?
A. I don't recall...."

25. Paragraph 2.6, Amended 1987 agreement, see note 5, supra.

26. *Ohio Fuel Co. v. McKain*, 103 Okla. 121, 229 P. 414, 416 (1923).

27. *Buckner v. General Motors Corp.*, see note 11, supra.